# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,
        Plaintiff,

v.                                         Case No. 09-CR-20

COREY SMITH
        Defendant.

## SENTENCING MEMORANDUM

A jury convicted defendant Corey Smith of conspiracy to distribute 5 kilograms or more of cocaine, 21 U.S.C. §§ 841(a)(1), (b)(1)(A), & 846, and distribution of cocaine, 21 U.S.C. § 841(a)(1) & (b)(1)(C), and I ordered a pre-sentence report ("PSR") in anticipation of sentencing. In imposing sentence, the district court must first calculate the defendant's advisory sentencing guideline range, then determine the ultimate sentence under all of the factors set forth in 18 U.S.C. § 3553(a). See United States v. Panice, 598 F.3d 426, 441 (7th Cir. 2010).

## I. GUIDELINES

Defendant's PSR set a relevant conduct drug weight of 5.358 kilograms of cocaine, producing a base offense level of 32 under U.S.S.G. § 2D1.1(c). Because defendant went to trial and contested guilt, the PSR denied a reduction for acceptance of responsibility. Given his lack of prior record, the report set a criminal history category of I, thus producing an imprisonment range of 121-151 months (with a 10 year statutory minimum).

Defendant filed objections to the PSR's relevant conduct determination and the denial of reductions for minor role in the offense, U.S.S.G. § 3B1.2, acceptance of responsibility, U.S.S.G. § 3E1.1, and safety valve, U.S.S.G. §§ 2D1.1(b)(16) & 5C1.2. The government

supported the PSR's drug weight and base offense level determinations and opposed the reductions defendant sought.  Regarding the safety valve issue, the government agreed that defendant satisfied the first four safety valve criteria, and that he had, after the trial, provided a truthful and complete debrief statement to case agents.[1]  However, the government argued that defendant's PSR objections, which included challenges to his relevant conduct and role in the offense, were inconsistent with the full disclosure required under the fifth factor of the safety valve provision.  See United States v. Thompson, 106 F.3d 794, 800-01 (7th Cir. 1997). The government indicated that if defendant withdrew these objections it would not oppose safety valve.

I adjourned the sentencing hearing to permit defendant to discuss the matter with counsel and fully consider his options.  Prior to the adjourned hearing, defense counsel submitted a letter indicating that the parties had resolved the guideline issues: defendant would withdraw his objections to the PSR regarding relevant conduct, role in the offense, and acceptance of responsibility, and the government would withdraw its opposition to defendant's safety valve eligibility.  Therefore, the parties agreed to a base offense level of 32, based on relevant conduct of 5.358 kilograms of cocaine, with a 2 level reduction under the safety valve provision of U.S.S.G. § 2D.1.1(b)(16), for a total offense level of 30.  Combined with the criminal history category of I, level 30 produced a guideline range of 97 to 121 months.

---

[1] To obtain the safety valve, a defendant must establish that: (1) he had no more than 1 criminal history point; (2) he did not use violence or credible threats of violence or possess a firearm or other dangerous weapon in connection with the offense; (3) the offense did not result in death or serious bodily injury to any person; (4) he was not an organizer, leader, manager, or supervisor of others in the offense; and (5) not later than the time of the sentencing hearing, he truthfully provided to the government all information and evidence he has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan.  U.S.S.G. § 5C1.2(a).

After confirming that defendant understood and agreed with this resolution, I adopted the guideline calculations submitted by the parties, finding them consistent with the evidence of record. Defense counsel indicated that he wished to maintain certain of the factual objections to the PSR, even though they did not affect the guideline range. I therefore addressed them on the record.

Defendant's factual objections to ¶¶ 19-21 of the PSR, part of the offense conduct section, were mainly semantics. Regarding ¶ 19, defendant noted the PSR's statement that he accompanied co-conspirator Misty Dolgner "several" times to pick up cocaine in Illinois. He conceded that Dolgner testified at trial that he accompanied her three or four times, which qualified as several. Defendant further conceded that even though he did not personally participate in the transactions once they arrived in Illinois – Dolgner went in alone – he knew what was occurring. He cited a portion of Dolgner's testimony in which she stated that she would not characterize defendant as a courier. However, it was clear that defendant went to Illinois on several occasions with Dolgner and at least once by himself, transporting cocaine. As discussed later, the evidence showed that defendant was more than a courier.

Regarding ¶ 20, defendant objected to the PSR's assertion that he "routinely" stored cocaine for co-conspirator Lewis Judkins. As he conceded, Dolgner testified at trial that she gave cocaine to defendant after returning from Illinois about half a dozen times. I found her testimony credible. He also disliked the statement that he "regularly" delivered cocaine to customers on behalf of Judkins, noting trial testimony of about five deliveries. I did not believe the PSR inaccurately characterized events in this regard. The evidence presented at trial certainly permitted the reasonable inference that defendant delivered cocaine on other occasions not specifically mentioned in the trial testimony.

3

Defendant objected to certain factual information in the offender characteristics section (Def.'s Objections at 5), but the revised PSR included corrections on these issues. I accepted the clarification regarding defendant's employment, PSR ¶¶ 64-68.

Defense counsel confirmed on the record that he had no further PSR objections for the court to address. Accordingly, I otherwise adopted the facts set forth in the PSR and the guidelines as set forth above.

## II.  SECTION 3553

### A.  Sentencing Factors

Section 3553(a) directs the court, in determining the particular sentence to be imposed, to consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct;  (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the [advisory] sentencing [guideline] range[;]
>
> (5) any pertinent policy statement . . . issued by the Sentencing Commission[;]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  After considering these factors, the court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph

4

(2) of this subsection." Id.

While the guidelines serve as the starting point in making this determination, Gall v. United States, 552 U.S. 38, 49 (2007), the district court may not presume that a guideline sentence is the correct one, Nelson v. United States, 129 S. Ct. 890, 892 (2009). Rather, the court must make an independent determination, without any thumb on the scale favoring a guideline sentence, United States v. Sachsenmaier, 491 F.3d 680, 685 (7th Cir. 2007), taking into account the types of sentences available, the relevant § 3553(a) factors, and the arguments of the parties, see Gall, 552 U.S. at 49-50. Because defendant qualified for the safety valve in this case, I retained full discretion under § 3553(a), notwithstanding the mandatory minimum that otherwise would have applied. See United States v. Tanner, 544 F.3d 793, 795 (7th Cir. 2008).

**B.    Analysis**

    **1.    The Offense**

This prosecution arose out of the government's investigation of a drug trafficking organization headed by defendant's brother, Lewis Judkins. Assisted by defendant and others, Judkins obtained large amounts of cocaine from Chicago-area sources and distributed it throughout Sheboygan County, Wisconsin. The investigation involved the use of GPS tracking, which revealed that Judkins's assistants made numerous trips to Illinois to obtain cocaine, and a wiretap on Judkins's phone, which provided further evidence regarding his activities. At trial, Misty Dolgner, one of Judkins's assistants, testified that she went to Illinois one to three times per week, typically obtaining nine ounces of cocaine per trip. The frequency of her trips was

5

confirmed by the GPS.[2]

Defendant's role was further fleshed out at trial. As far back as March 2007, he delivered cocaine to a man named Ray Evans on behalf of Judkins. He also accompanied Dolgner to Chicago on a number of occasions to pick up cocaine. On at least one occasion, he traveled to Chicago alone to pick up nine ounces of cocaine. The trial evidence also revealed that he stored cocaine for Judkins, delivered cocaine to customers, and collected money. He also warned Judkins about someone he believed to be cooperating with law enforcement. In sum, the evidence showed that defendant was substantially involved in the Judkins drug trafficking conspiracy.

The jury determined that the conspiracy involved more than 5 kilograms, and I concluded – and the parties agreed – that more than 5 kg was properly attributed to defendant. Based on the evidence, it was foreseeable to defendant that more than 5 kilograms would be trafficked pursuant to his jointly undertaken activity. The recorded calls showed that he was a trusted Lieutenant for Judkins: he picked up drugs in Chicago, stored drugs, and delivered drugs. Judkins also made defendant a co-signor on a safety deposit box from which drug proceeds were seized. Defendant's interest in the conspiracy's activities was further exemplified by his warning Judkins about a possible cooperator. On December 2, 2008, defendant delivered two ounces of cocaine to a government cooperator on behalf of Judkins, representing the substantive count of conviction.

**2.    The Defendant**

At the age of thirty, defendant had no prior record. He graduated from high school,

---

[2]The GPS evidence, summarized in trial exhibit 30, showed fifty-six trips from April 2008 to December 2008.

6

completed some college, served in the military, and compiled a decent work record, including the maintenance of full-time employment prior to remand while this case was pending. His supervisor wrote a positive letter. (Def.'s Sen. Mem. [R. 151] Ex. 1.) I also received a positive letter from his fiancé, the mother of his youngest child. (R. 153.) Defendant had two other children from previous relationships and owed substantial support arrears, $11,000 for one and $6000 for the other.

It appeared that defendant had substance abuse issues prior to his arrest in the case, although the nature and extent of his problem was not clear. At trial, the defense appeared to be that while defendant smoked marijuana with Judkins and Dolgner, he was not involved with cocaine. However, defendant told the pre-sentence writer that he smoked marijuana approximately twice per year, but used cocaine daily prior to his arrest. (PSR ¶ 59.) His fiancé told the PSR writer that she knew defendant smoked marijuana but was unaware he used cocaine. The defense sentencing memo stated that defendant used cocaine and marijuana on a near daily basis before his arrest, an assertion reiterated at the sentencing hearing. All of defendant's drug screens on bond were negative.

But for one violation, defendant complied with his other pre-trial release conditions prior to his remand in this case, and he did appear to be doing well. I reviewed the letters attached to the defense submission, which depicted a person with positive qualities. For example, defendant's fiance's mother discussed defendant's assistance to the less fortunate, his fiance's sister related how defendant helped her husband become a better man, his friend discussed his hard-working and generous nature, and his cousin mentioned his respectful manner. (Def.'s Sen. Mem. Ex. 4.) Defendant made an effort to help Judkins's children after Judkins went to prison for his role in the conspiracy. I also read defendant's letter and considered his

7

allocution.

In his sentencing memo, defendant discussed his apparent thought process in taking the case to trial. He stated that he compared himself to others charged in state court and believed he would receive a sentence of at least 3 years under the government's proposed plea agreement, which he did not think fair.[3] Defendant made a decision he was certainly entitled to make, but given all the proceedings in this case he could not plausibly argue that he lacked a full understanding of his options, the possible consequences of his decision, or the advisory nature of the sentencing guidelines. He also made some allegations about lack of communication with trial counsel, but the court conducted numerous proceedings in this case regarding whether defendant would plead or go to trial, so it could not plausibly be argued that defendant did not understand the nature of his choice. Nor could I see any indication that trial counsel was to blame for any decisions defendant made regarding this case.

Defendant did debrief with case agents after trial, ultimately providing a statement sufficient to earn the safety valve. The safety valve entitled him to a 2-level reduction under the guidelines and lifted the mandatory minimum set by statute, see 18 U.S.C. § 3553(f), but I did not see it as adding much to my § 3553(a) analysis. This appeared to be a post-trial effort to salvage the possibility of a lower sentence, an understandable goal, but not something that meaningfully contributed to my analysis of defendant's character or prospects for the future.

**3.    The Sentence**

The guidelines called for a term of 97-121 months, and the government recommended 80 months. I agreed that a fairly substantial prison sentence was needed in this case, given

---

[3]Defendant indicated that under the proposed agreement he would plead guilty to the substantive count, with a projected guideline range of 37-46 months.

8

the scope of the conduct, including the large amount of cocaine involved.

Defendant argued for a far lesser term, 18 months, but that was based in large part on his claim to more limited involvement in the conspiracy than the evidence demonstrated. As discussed, defendant was an important component of Judkins's operation. I disagreed with the assertion that his role was much more limited than the other participants charged in federal court. For instance, contrary to the argument in the defense memo, his involvement was not limited to a narrow time-frame; he sold drugs with Evans and Judkins going back to at least 2007. The fact that he was not mentioned in the application to tap Judkins's phone simply reflected the focus and knowledge of law enforcement at that time; now, with all the facts in, the court could assess defendant's role.[4]

---

[4]As defendant withdrew his relevant conduct and minor role objections, it was unnecessary to review all of the evidence pertaining to these issues. Nevertheless, for the sake of completeness, I note that the evidence does not support defendant's claim that, while he was aware of Judkins's trafficking activities, he agreed only to participate in a limited number of transactions and to obtain 9 ounces from a Chicago supplier on one occasion. The evidence showed that defendant joined the conspiracy as a whole. He agreed to store cocaine for Judkins; he made deliveries for Judkins; he picked up money for Judkins; and he warned Judkins about a possible cooperator. The recorded calls with Ray Evans further demonstrate defendant's deep involvement in the conspiracy. Evans referred to his previous arrest from 2007 where "we all caught this case together," meaning defendant, Judkins, and Evans. (Trial Ex. 146.) The calls also revealed Judkins's trust of defendant. On one occasion, when Dolgner said she could not go to Illinois, Judkins immediately asked defendant, who was in the car with Dolgner. (Trial Ex. 78.) Dolgner testified that Judkins trusted her and defendant the most. The tone of the other recorded calls also suggested a deep involvement with Judkins. For example, on November 26, 2008, Judkins called defendant to ask what "you got left." (Trial Ex. 55.) On December 3, 2008, defendant told Judkins "I'm just taking care of a move real quick." (Trial Ex. 154.) Dolgner testified, and the recorded calls and documentary evidence confirmed, that defendant's name was on Judkins's safe deposit box, where they kept drug proceeds, and defendant was entrusted with keys to Judkins's safe house at times. He was also entrusted to collect significant amounts of money, as shown in trial exhibits 90 and 91. In sum, the evidence overwhelmingly showed that defendant joined the conspiracy as a whole, and that the reasonably foreseeable acts in furtherance of defendant's jointly undertaken criminal activity exceeded 5 kilograms of cocaine. In the withdrawn objections, defendant also argued that Judkins, the leader, and Dolgner and Hawver, the primary couriers, were far more

9

Defendant argued that he was charged federally only because he is Judkins's brother, but the evidence at trial strongly established his significant role in this conspiracy. It may be that defendant was drawn into the conspiracy due to his relationship with Judkins, but at his age he had to take responsibility for his own actions. Further, as the government noted, defendant benefitted from the association, as Judkins passed customers on to defendant.

Defendant also argued that I should consider possible disparity with the sentences imposed on others who were involved with Judkins but charged in state court. As defendant conceded, the Seventh Circuit has frowned on state/federal sentencing disparity arguments. See, e.g., United States v. Brown, 610 F.3d 395, 398 (7th Cir. 2010); United States v. Schmitt, 495 F.3d 860, 863 (7th Cir. 2007). However, I accepted that this was a factor I could consider. Nevertheless, I declined to exercise my discretion to impose a lower sentence based on the argument in this case. Defendant noted that many of the state side defendants avoided prison, but he did not provide me with details on their situations – what they did, what their records were like, whether they pleaded guilty or went to trial. Defendant primarily compared himself to Ty Turner (who received a sentence of probation with conditional jail time in state court), and defendant did provide some information about Turner's conduct and prior record. However, it appeared that Turner entered a plea rather than going to trial, which marked one significant

---

involved than he was. He argued that his role was relatively small in that he was asked on occasion to deliver small amounts, put up cocaine a few times, and pick up cocaine when Dolgner was not available. However, defendant downplayed his involvement. While Judkins was the leader, defendant occupied a significant position of trust within the organization. Further, defendant participated over an extended period of time, in a variety of ways, as discussed. He clearly understood the scope and structure of the enterprise and the activities of others, as exemplified in the recorded calls. He traveled to Illinois to pick up drugs, alone or with Dolgner, several times; he made deliveries and picked up money; and he stored drugs. Judkins trusted him with access to the safe deposit box and with keys to one of the safe houses.

difference with defendant. Further, as the government indicated without contradiction at sentencing, Turner had a buyer-seller relationship with Judkins; he did not join the conspiracy, as defendant did. In any event, I found that the purposes of federal sentencing I had to consider required a more significant sentence than defendant requested and the state defendants received.

Given the positives in defendant's character reflected in the letters, as well as his work history, military service, lack of prior record, good conduct on bond, and strong family support, I found that a sentence below the range would suffice to protect the public and deter. Under all the circumstances, I found a sentence 48 months sufficient but not greater than necessary to satisfy the purposes of sentencing. This term provided just punishment for this serious crime and deterrence to others, while acknowledging the mitigating factors suggesting that a lesser term would suffice to protect the public from and deter defendant in the future.

## III. CONCLUSION

Therefore, for these reasons and those stated on the record, I committed defendant to the custody of the Bureau of Prisons for 48 months. Based on his financial situation, I found that defendant lacked ability to pay and thus waived a fine. Upon release, I ordered defendant to serve 3 years of supervised release, a term sufficient but not greater than necessary to ensure monitoring, treatment, and legitimate employment.

Dated at Milwaukee, Wisconsin, this 11th day of January, 2012.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge